**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MICHAEL MONROE,

        *Plaintiff,*

  vs.

                                      Case No. 13-2086-EFM

CITY OF LAWRENCE, KANSAS

and

TARIK KHATIB,

        *Defendants.*

**MEMORANDUM AND ORDER**

After 21 years of seemingly irreproachable public service, Police Sergeant Michael Monroe was fired. But not just fired; by his account, fired for being in the wrong place (in the Lawrence Police Department), at the wrong time (during the 2011–2012 Kansas University ticket scandal), with the wrong people (biased decisionmakers), and having the wrong skin color (black). Feeling wronged for doing right, Monroe filed this lawsuit. Plaintiff Monroe sues the City of Lawrence, Kansas, and its Chief of Police, Tarik Khatib, to vindicate Sergeant Monroe. The Court is left to decide whether, under the circumstances presented, feeling wronged amounts to being wronged. Because the facts do not show that Defendants terminated Monroe due to his race and without due process, the Court grants Defendants' two motions for summary judgment,

denies Plaintiff's two motions for summary judgment, and denies as moot the parties' remaining five motions.

## I.      Factual and Procedural Background[1]

Defendants City of Lawrence and its Chief of Police, Tarik Khatib, employed Plaintiff Michael Monroe, an African-American, as a Police Sergeant in the Investigations Division of the Lawrence Police Department ("LPD").   Then the Kansas University ("KU") ticket scandal arrested the public's attention and caused Defendants to scrutinize more closely the activities of their police department.   Following a series of external and internal investigations, Defendants terminated Monroe.

*The Investigation*

The LPD conducted two internal investigations associated with the ticket-fixing scandal based on two anonymous tips.   Both tips mentioned that improper activities occurred between certain LPD officers and KU Athletic Department employees.   The first investigation, based on a 2010 anonymous tip, produced insufficient information to justify disciplinary action according to then Chief of Police, Ron Olin.   The second investigation, based on a February 2011 anonymous tip, produced sufficient information to justify disciplinary action according to then Chief of Police, Defendant Khatib.

The LPD's Office of Professional Accountability interviewed Monroe at least three times during the 2011–2012 investigation.   During the first two interviews, Monroe explained that several years earlier, at the request of MS (a subordinate LPD officer and friend), Monroe dismissed two to three traffic citations given to RJ, a KU Athletic Department employee.

---

[1] In accordance with summary judgment procedures, the Court sets forth the uncontroverted facts and relates them, where possible, in the light most favorable to the non-moving party.

Monroe explained that he dismissed the tickets because RJ and MS were friends.   Monroe estimated that, over the course of his career, he had dismissed "10 to 15" tickets for certain family and friends, including SN, another KU Athletic Department employee.   Monroe also described attending certain athletic events using tickets and parking passes originally provided by RJ or SN.   With the exception of certain Big 12 tournament tickets, Monroe stated that he paid to attend each KU athletic event.   Monroe denied that he dismissed RJ's (or any other) traffic citations in exchange for KU athletic tickets.   But he admitted that he was aware of MS and RJ's relationship, that their relationship made him uncomfortable, and, eventually, his opinion of RJ caused him to discontinue his own association with RJ.   At the beginning of his second interview, Monroe also recalled "that maybe [he] should have brought up" during the first interview that, following MS's suggestion, he had his wife purchase RJ a bottle of vodka.

*The Discipline*

Based on a review of Monroe's interviews and other investigation materials, Khatib decided to demote Monroe and fire MS.   MS resigned in lieu of termination.   Khatib's February 13, 2012 demotion letter explains that Monroe violated several policies and job responsibilities, including policies related to gratuities, solicitation, the dismissal of complaints, and reporting obligations.   Khatib discussed his letter with Monroe at a meeting that same day.   Based on Monroe's oral denial of the facts and violations discussed in the February 13 letter, Khatib postponed his discipline determination.   Khatib decided to allow Monroe to respond in writing to the demotion letter and to undergo one final interview.   Monroe responded on February 15 with a letter explaining his objections to Khatib's demotion letter.   On February 21, the Office of Professional Accountability interviewed Monroe a third time.

On March 7, Khatib met with Monroe and told him that, instead of demotion, Monroe would be terminated, effective March, 22, 2012.  Khatib's March 7 termination letter explains that a further study of all three interviews showed that Monroe's misconduct "was more extensive and serious than [Khatib] realized when [his] February 13, 2012 letter . . . was prepared and delivered."   For example, Khatib considered statements during Monroe's third interview to reveal a recent, undisclosed gratuities violation.  Khatib wrote:

> you advised that you had again accepted as a gratuity tickets to a KU basketball game from [ML], a person associated with KU athletics and one for who[m] you had earlier caused traffic tickets to be dismissed.  Your acceptance of these tickets as late as January 16, 2012, and while the investigation of this matter was ongoing further underscores your lack of judgment.

Khatib's understanding of the investigation also conflicted with certain statements that Monroe allegedly made to Khatib either at their February 13 meeting or in his February 15 letter opposing demotion.  Khatib elaborated:

> your assertion in your written letter that your wife is the person who utilized the parking permits, in combination with your letter's omission of your direct participation and benefit of the value of these parking passes, is evasion of direct culpability and a clear lack of candor.
> . . . .
> You stated you did not receive anything related to [RJ] for free. . . .  You also stated that you had never received tickets from [MS].  These statements appear to be misrepresentations of the facts. . . .  the investigation had found that you received three 2007 tournament game tickets from [RJ]. . . . .  Additionally, you attended a basketball game at Allen Field House . . . [with] tickets from [MS].

In total, Khatib found "a clear lack of acceptance of responsibility . . . and a lack of candor" that violated City policy and "would require a mandatory *Brady/Giglio* disclosure."   Such a disclosure "would taint any criminal investigation [Monroe] may be involved with." Accordingly, Khatib advised Monroe of his intent to seek Monroe's termination.  In closing, Khatib indicated that Monroe could "exercise the rights afforded to [him] by the City grievance

policy" attached to the letter.   The City's grievance procedure provides a five-step conflict-resolution process.   Step by step, Monroe opposed Khatib's disciplinary decision.

*Step One.*   Monroe prepared a written response to Khatib's termination letter and sent that response to Khatib on March 20.   Monroe's response argued in detail that Khatib's termination letter contained numerous factual inaccuracies.   Monroe admitted his confidence that "in a full airing of the issues, it will be clear that [Khatib] had information when [he was] in charge of Internal Affairs . . . and took no action."   Monroe also opined that Khatib's *Brady/Giglio* conclusion is legally erroneous and "contrived to procure [his] dismissal."   Monroe reasoned that Khatib "would have made that recommendation in the February 13 letter" if, in fact, Monroe's lack of credibility and candor were the genuine basis for dismissal.   Instead, Monroe speculated that the conclusion "is a pretext for an ulterior motive that the department is not willing to put on paper."   One ulterior motive that Monroe suggested in a footnote is that Khatib elevated his discipline to termination as "improper retaliation for initiating the grievance process with [his] February 15 letter" that objected to Khatib's initial recommendation.

According to the City's grievance procedure, Khatib made himself available to meet with Monroe one last time before termination so that Monroe could present information in support of the reasons why Khatib should not recommend Monroe's discharge.   After considering Monroe's March 20 letter and meeting with Monroe on March 21, Khatib submitted his employment decision to the city manager for approval.   Consistent with City policy, City Manager David Corliss approved Monroe's termination, effective March 22, 2012.   Corliss' approval concluded step one of the City's grievance procedure.

*Step Two.*   Monroe then pursued step two of the City's grievance procedure.   An employee dissatisfied after meeting with his immediate supervisor at step one must, at step two,

meet with his department director.  As the chief of police, Khatib also functioned as the LPD's department director.  On May 4, Monroe submitted his step-two grievance statement.  Monroe disagreed with Khatib's understanding of the facts.  He also discredited Khatib's disciplinary findings because he believed them inconsistent with the LPD's actual practices and treatment of other officers.  Monroe requested to return to active service at his current rank.  The addendum elaborating on Monroe's objections substantially repeats the arguments contained in his March 20 letter.  On May 14, Monroe again discussed in-person with Khatib his objections to Khatib's termination decision.  Following that meeting, Khatib issued a written reply.  The reply emphasized that Khatib's "prior letters fully and accurately state [his] position with respect to the legitimate, non-discriminatory reasons for [Monroe's] termination; nevertheless, the reply also addressed "some of the more specific allegations" made in Monroe's step-two letter.  Ultimately, Khatib concluded that he was unable to resolve Monroe's grievance by reinstating his employment with the LPD.

*Step Three.*   Monroe immediately appealed Khatib's decision under step three of the City's grievance procedure to a five-person grievance review board.  After the grievance board was selected, Khatib and Monroe made written, prehearing submissions to the board.  Khatib's June 4 grievance board submission admitted that "the decision to terminate Michael Monroe's employment . . . was not easy."  According to Khatib, "Monroe was an above average employee" that "represented the LPD well," but "Monroe's own actions, not anyone else's, gave [Khatib] no choice."  Khatib identified nine policies allegedly implicated by Monroe's conduct and discussed at length the facts supporting termination.  Khatib concluded that the termination of an employee whose actions undermine the public's trust in law enforcement is "a necessary decision."

On June 12, Monroe provided his own written submission to the grievance board. Monroe reiterated his position that factual errors and erroneous application of City policies and Kansas law undermine Khatib's termination decision.  Again, Monroe questioned Defendants' inaction following the 2010 investigation.  Monroe also raised a new issue.  According to Monroe, the City deviated from its grievance policy and treated him unfairly.  Monroe described three alleged deviations.  First, Khatib wrote his step-two reply letter before the step-two meeting.  Second, Khatib told Monroe that knowing the unspecified reasons for dismissal referred to in Monroe's step-two letter would not alter Khatib's disciplinary decision.  Third, the City withheld information allegedly critical to Monroe's defense by denying him access to or redacting certain documents.  As "a loyal and effective member of [the LPD] since 1991," Monroe concluded his submission by expressing his steadfast commitment to continuing his chosen career as a member of the LPD.

From June 25 to June 29, the grievance review board reexamined Khatib's decision. During the four-day hearing, Monroe and Khatib both had the opportunity to call and cross-examine witnesses, present evidence, and give closing statements.  On June 29, the grievance review board issued its decision.  The grievance board considered the evidence to show "that city/department policies were violated, failure of the employee to intervene, lack of use of good judgment and failure to carry out the duties of supervisor as outlined in the police sergeant city/department job description."  Based on those findings, the board decided to modify the discipline to demotion to the rank of police officer with commensurate pay.

*Step Four.*   In July 2012, both Khatib and Monroe appealed the grievance board's decision to the city manager under step four.  Monroe appealed to regain his position as an LPD sergeant.  Khatib appealed to seek termination as the appropriate discipline for Monroe's alleged

conduct.  Each explained in writing their basis for appeal; each offered arguments comparable to those made earlier in the grievance process.  Monroe's s submission summarized his view of the dispute:

> A full public airing of the . . . issues would demonstrate that the Chief of Police was fully aware of the possible misconduct of [MS] in 2010 and took no action.  The failure to act at the time establishes that the discipline imposed on me for failing to act is disproportionate to the alleged offense.  It is clear that when the Chief determined that the information would soon become public, he changed the rules and determined that I should have come forward sooner despite his earlier failure to act.  These facts will certainly lead the public to believe that there was a cover-up at the police department, and that the only African-American supervisor on the Police Department was put forward as the scapegoat.[2]

On July 16, City Manager Corliss met with Monroe and Khatib to discuss their appeals.  One week after the meeting, Corliss issued a written decision rejecting the grievance board's determination of discipline and upholding Monroe's dismissal.  According to the City's grievance procedure, Corliss' decision at step four was final and subject to no further appeal.

*The Resulting Press*

During the course of investigation and Monroe's grievance process, Defendants issued two press releases to the media and filed a termination report with the Kansas Commission on Peace Officers Standards and Training.  The press releases generally discuss the LPD's response to the 2011 anonymous tip.  Specifically, the statements confirm that the LPD's investigation uncovered misconduct.  The media statements do not identify the officers under investigation.  Only the termination report specifically names Monroe.  That report, made according to Kansas law and available to state law enforcement agencies, states:

> An investigation was conducted into an allegation of tickets being dismissed in exchange for Kansas University Athletic Event Tickets.  Mr. Monroe

---

[2] July 9, 2012 Monroe Step-Four Appeal.

was one of the officers being investigated and as such was suspended pending the outcome of the investigation.

During the course of the investigation, Mr. Monroe was untruthful with investigators. Mr. Monroe was terminated at the conclusion of the investigation.[3]

*The Current Lawsuit*

Monroe filed this suit on February 19, 2013. Monroe claims that Defendants terminated him because of his race. He also claims that the City deprived him of his liberty interest by publishing false statements about him during the course of his termination that impugned his good name and will foreclose other employment opportunities. Monroe further argues that this deprivation occurred without due process because his decisionmakers were biased. Both parties moved for summary judgment on each of Monroe's claims. On July 31, 2015, the parties argued their motions to the Court.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[4] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[5] A fact is "material" when "it is essential to the proper disposition of the claim."[6] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[7] The nonmovant must then produce specific facts showing a genuine issue

---

[3] April 11, 2012 KS-CPOST Report.

[4] Fed. R. Civ. P. 56(a).

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[6] *Id.*

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

for trial.[8]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[9]   The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[10]

Though the parties in this case filed cross-motions for summary judgment, the legal standard remains the same.[11]   Each party retains the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[12]   Each motion will be treated separately.[13]   "To the extent the cross-motions overlap, however, the court may address the legal arguments together."[14]   Also, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties."[15]   Nevertheless, summary judgment is inappropriate is disputes remain as to material facts.[16]

---

[8] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000).

[10] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[11] *City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[12] *United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F. Supp. 1375, 1381–82 (D. Kan. 1997) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir. 1983)).

[13] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[14] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).   The parties' motions substantially overlap.

[15] *Atl. Richfield Co.*, 226 F.3d at 1148.

[16] *Id.*

## III.      Analysis

## A. Race Discrimination in Violation of 42 U.S.C. §§ 1981(a)[17] and 2000e-2(a) ("Title VII")[18]

Monroe claims by indirect evidence that Defendants discriminated against him on the basis of his race in deciding to terminate his employment.  Absent direct evidence of racial discrimination, the parties' burdens of proof are subject to the tripartite *McDonnell Douglas* framework.[19]  "[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in *McDonnell Douglas*, whether the case is brought under §§ 1981 or 1983 or Title VII."[20]  First, Monroe carries the initial burden of establishing a prima facie case of racial discrimination.[21]      Second, the burden shifts to Defendants to provide a legitimate, nondiscriminatory reason for its actions.[22]  Third, the burden then returns to Monroe to prove that the Defendants' stated reason for his termination is a pretext for discriminatory intent.[23]  If a party fails to meet its burden, the Court's inquiry ends and judgment as a matter of law should be entered against that unsuccessful party.[24]  But if each party meets its burden, the plaintiff "withstand[s] summary judgment  . . . and is entitled to go to trial."[25]

---

[17] Monroe asserts § 1981 liability against both the City and Khatib (in his individual capacity).

[18] Monroe asserts Title VII liability against only the City.

[19] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972); *McDonald v. Boeing Co.*, 602 F. App'x 452, 455 (10th Cir. 2015).

[20] *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995) (*quoting Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991)).

[21] *McDonnell Douglas*, 411 U.S. at 802.

[22] *Id.*

[23] *Id.* at 804.

[24] *Id.* at 807.

[25] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000); *see also Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) ("The ultimate factual determination of whether the employer's

**1. Prima Facie Case**

The prima facie case requires Monroe to demonstrate that his termination occurred "under circumstances which give rise to an inference of unlawful discrimination."[26]  To meet his burden, Monroe primarily argues that Defendants treated nonprotected employees more favorably.  A plaintiff asserting discriminatory discharge, however, "does not have to show differential treatment of persons outside the protected class to meet the initial prima facie burden under *McDonnell Douglas*."[27]  An inference of discriminatory discharge arises if "an employee who belongs to a racial minority . . . eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job."[28]  Accordingly, a prima facie case of discriminatory discharge generally requires Monroe to produce evidence that: (1) he belongs to a protected class; (2) he was qualified and satisfactorily performing his job duties; (3) despite his qualifications, he was fired; and (4) his position was not eliminated after his discharge.[29]  The burden of establishing a prima facie case is "not onerous" but, rather, "*de minimis*."[30]

Though Monroe makes more onerous the *de minimis* work required of him, his labors yield adequate evidence to conclude that he has met his prima facie burden.  "As a black man,

---

decision was motivated by intentional discrimination based upon protected class characteristics is for the trier of fact.").

[26] *Kendrick*, 220 F.3d at 1227 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[27] *English v. Colo. Dept. of Corrs.*, 248 F.3d 1002, 1008 (10th Cir. 2001).

[28] *Kendrick*, 220 F.3d at 1229.

[29] *Id.* ("The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.").

[30] *Plotke v. White*, 405 F.3d 1092, 1099, 1101 (10th Cir. 2005) (quoting *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001)).

[Monroe] clearly meets the first prong."[31]   Monroe also meets the second and third prongs. Defendants do not dispute Monroe's evidence that (circumstances of his termination excluded) he represented the LPD well as an above average employee during his approximately 21-year career.  Defendants also acknowledge and the evidence corroborates that they fired Monroe. While neither party presents evidence that Defendants eliminated Monroe's position as a Sergeant in the Investigations Division of the LPD after his discharge, the Court is comfortable concluding that Defendants terminated Monroe for alleged cause and not coincident to a workforce reorganization or reduction.[32]  Finding sufficient evidence for each prima facie prong, Monroe demonstrates that Defendants fired him under circumstances supporting an inference of unlawful discrimination.

## 2. Legitimate Nondiscriminatory Reason

The burden now shifts to Defendants to articulate through admissible evidence some legitimate, nondiscriminatory reason for firing Monroe.  Defendants need not "litigate the merits of the reasoning, nor  . . . prove that the reason relied upon was bona fide, nor  . . . prove that the reasoning was applied in a nondiscriminatory fashion."[33]  Instead, Defendants need only "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII."[34]

---

[31] *Kendrick*, 220 F.3d at 1229.

[32] *See English*, 248 F.3d at 1008 ("Neither party has raised evidence tending to show whether [plaintiff's] position was eliminated after his discharge.  However, given [defendant's] stated reason for firing [plaintiff] . . . we have no trouble concluding that there is sufficient evidence in the record to find [plaintiff] was not terminated because of a workplace reduction.").

[33] *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).

[34] *Id.* (quoting *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000)).

Defendants do not provide *a* reason but *several* facially neutral reasons to support firing Monroe. Defendants characterize Monroe's misconduct as:

> (1) accepting gratuities; (2) abusing his supervisory position to void municipal traffic violation complaints . . . ; (3) circumventing the review process identified within the Court Dismissal Policy by voiding approximately 10–15 traffic complaints for friends and family—this number was excessive and constituted an abuse of Monroe's position as a supervisor; (4) failing to utilize good judgment by going to municipal court to void tickets, despite thinking he should not be doing this; (5) failing to intervene in a situation as a supervisor in which he clearly should have for the welfare of a fellow officer and the Department; (6) failing to be forthcoming with information during the 2011–12 Investigation; and (7) untruthfulness.[35]

Records from the grievance process corroborate Defendants characterization. Specifically, those records identify that Monroe's alleged misconduct disregarded eight personnel policies and various duties, responsibilities, and qualifications included in his police sergeant job description. Each alleged violation would be a legitimate, nondiscriminatory basis for termination.[36]

## 3. Pretext

Monroe must now present sufficient evidence for a jury to reasonably conclude that Defendants' race-neutral reasons for dismissal are merely a pretext concealing intentional racial discrimination. Evidence revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for the termination may support an inference of pretext.[37] Courts consider three typical, though nonessential, methods of proving pretext:

---

[35] Defendants' Memorandum in Support of Motion for Summary Judgment on Counts II and II (Discrimination Claims).

[36] *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175–76 (10th Cir. 2004) (citation omitted) ("Because [defendant's] reasons are not 'facially prohibited by Title VII,' we agree . . . that [defendant] has articulated a legitimate, nondiscriminatory reason for terminating [plaintiff].").

[37] *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014).

(1) evidence that the defendant's stated reason for the adverse employment action was false; (2) evidence that the defendant acted contrary to a written . . . policy prescribing the action to be taken by the defendant under the circumstances; or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to [the employer's] practice when making the adverse employment decision affecting the plaintiff.[38]

Monroe offers evidence under each method, but only respecting a single and penultimate decisionmaker, Khatib.  Generally, the pretext analysis should focus on the final decisionmaker, "not the acts or motives of those who may be in the decision-making chain."[39]  If a "supervisor's ability to make employment-related decisions is contingent on the independent affirmation of a higher-level manager. . . , we focus on the motive of [that] final decisionmaker."[40]  Here, the evidence shows that Khatib's termination decision ultimately required approval from City Manager David Corliss.  Monroe presents no evidence specifically attacking Corliss' acts and motives.  Instead, Mornoe's pretext arguments focus on his supervisor, Khatib.  Monroe fails to prove pretext on that basis alone.[41]

However, "if the final decisionmaker merely relies on possibly biased reports or conclusions of others, rather than conducting an independent investigation, our focus shifts back to the supervisor."[42]  Thus, for the purposes of addressing Monroe's pretext arguments, the Court will assume without deciding that Corliss indiscriminately adopted Khatib's allegedly discriminatory disciplinary determination.   In considering Monroe's evidence of pretext

---

[38] *Id.* (quoting *Kendrick*, 220 F.3d at 1230).

[39] *Id.* at 715.

[40] *Id.*

[41] *See Didier v. Abbot Labs.*, 2015 WL 4591931, at *9 (10th Cir. July 31, 2015) (explaining that "[s]ince [plaintiff's supervisor] was not the final decisionmaker over [plaintiff's employment]," his actions cannot support an inference of discrimination).

[42] *Macon*, 743 F.3d at 715.

concerning Khatib, the Court must view "the facts as they appear to the person making the decision to terminate."[43]   The Court also must not second-guess business judgments made in good faith.[44]

### a. Reasons for Dismissal

Monroe first argues that Khatib's stated reasons for termination are invalid.   "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."[45]   This inference arises, however, only if the evidence of falsity would enable the factfinder to conclude "that discrimination was a determinative factor in the employer's actions—simply disbelieving the employer is insufficient."[46]   It follows, therefore, that "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[47]

### i. Dishonesty

Monroe primarily disputes the characterization that he was untruthful with investigators. In his initial written decision terminating Monroe, Khatib found "a clear lack of acceptance of

---

[43] *Simmons v. Sykes Enteres., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (quoting *Kendrick*, 220 F.3d at 1231).   Still, the Court considers "the facts as they appear to the person making the decision to terminate" in the light most favorable to the nonmoving party.  *See Macon*, 743 F.3d at 713.

[44] *Simmons*, 647 F.3d at 947 ("Our relevant inquiry for determining pretext is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue. . . .   [o]ur role is . . . not to act as a 'super personnel department' that second guesses employers' business judgments.") (quotation marks and citations omitted).

[45] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 134 (2000).

[46] *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).

[47] *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006); *see also Rivera v. City and Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.").

responsibility, misrepresentation of the facts during interviews and in [Monroe's] written response, and a lack of candor."  Initially, Monroe argues that the timing of this determination shows that Khatib did not honestly believe that Mornoe was untruthful.  Monroe points out that Khatib did not characterize him as untruthful until after he challenged Khatib's initial demotion decision.  Khatib responds that he originally chose to overlook certain dishonest conduct in an effort to keep Monroe employed; but, after interviewing Monroe a third time to clarify certain facts necessary to his original demotion decision, Khatib concluded that Monroe continued to misunderstand or obscure his misconduct and thus could not be trusted to do his job.  Even accepting, as Monroe implies, that Khatib manufactured a charge of dishonesty in order to terminate Monroe for disputing Khatib's original determination, Monroe "remain[s] vulnerable to summary judgment because the . . . concession of a lawful motive  . . . take[s] the issue of motive from the jury and preclude[s] the inference of a discriminatory motive that the jury could otherwise draw."[48]  Stated otherwise, retaliation for challenging a supervisor's authority is not a prohibited discriminatory reason (even if concealed) that supports a civil rights action.[49]

Apart from scrutinizing the timing of Khatib's dishonesty determination, Monroe argues that Khatib could not honestly have believed that he was untruthful because, *in fact*, he was truthful.  To prove his honesty, Monroe directs the Court to certain statements during his first two interviews that allegedly disclose improper activities involving two KU Athletic Department

---

[48] *Randle*, 69 F.3d at 451 n.14.

[49] Monroe also presents no evidence that would allow a reasonably jury to infer that Khatib retaliated only against black employees that disagreed with his disciplinary decisions.  The unrefuted evidence that Khatib initially tried to keep Monroe employed despite considering his conduct grounds for termination also belies any racial animus.  *See McDonald*, 602 F. App'x at 457 ("Moreover, Plaintiff ignores the fact that the first two times he was selected for termination Defendant actually *assisted* Plaintiff in finding another job within the company—hardly a sign of racial animus.").

employees, SN and ML.  But the evidence regarding SN does not exactly address the law's concern—Khatib's expressed reasons for terminating Monroe.[50]  While Khatib noted evidence of Monroe's relationship with SN to support his termination decision to the grievance panel, Khatib never specifically identified Monroe's failure to timely disclose this relationship as evidence of dishonesty.  As such, Monroe's evidence concerning SN—which does, in fact, reveal that he originally explained that he received athletic tickets from SN and, also, dismissed two traffic tickets for her—misses the mark.[51]

Monroe's evidence concerning ML also misses the mark, but for a different reason; the evidence does not establish the facts that Monroe claims.  Khatib did specifically identify that Monroe withheld until his final interview the fact that he dismissed citations for ML and accepted—even during the ongoing ticket-fixing investigation—basketball tickets from ML. Monroe points to statements made during his initial (pre-demotion decision) and his final (post-demotion, pre-termination decision) interviews.  But only Monroe's pre-demotion statements are relevant to Khatib's determination of what information Monroe *originally* disclosed.[52]  In his initial interview, Monroe directly referenced "Mike" as a potential source for purchasing athletic tickets.  Unrelated to that discussion, Monroe also explained, "I have a friend of mine that works

---

[50] The Court's only concern in evaluating pretext is whether the alleged final decisionmaker's reasons for termination (not the parties' subsequent characterizations of those decisions) are so implausible or inconsistent as to permit a reasonable jury to infer that racial bias influenced the decisionmaker's determination.  *See Kendrick*, 220 F.3d at 1231 ("a challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff").

[51] Supposing that this evidence proves Khatib erroneously characterized Monroe as dishonest for withholding information about SN, this inconsistency still does not undermine Khatib's good faith belief that Monroe made other inconsistent and untruthful statements or, altogether, that other legitimate causes for discharge existed.  *See Whalen v. United Air Lines, Inc.*, 1992 WL 180124, at *4 (10th Cir. July 28, 1992).

[52] *See Young*, 468 F.3d at 1251 (emphasizing the "facts . . . known to the relevant decision makers within [the employer's business] at the time they made their decision to fire [plaintiff]" to conclude that the employer honestly believed that plaintiff intentionally misrepresented his time at work).

for KU that I am considering asking for a particular game to get tickets."  Monroe directs the Court to no additional statements from his pre-termination interviews.  Considering these statements, Khatib may well have known before his demotion decision that Monroe purchased tickets from ML and that Monroe was *considering* attending an upcoming game with *some* friend that works at KU.  But this knowledge does not amount to the information that Monroe eventually revealed regarding ML in his final interview.  Ultimately, Monroe "is not entitled to a determination of whether he was dishonest; rather, he is entitled only to a determination of whether the terminating [decisionmaker] could reasonably have thought so."[53]  Khatib reasonably could have thought that Monroe withheld information concerning his interactions with ML.

Lastly, Monroe seeks to prove his honesty by noting that the grievance board did not specifically conclude that he had been untruthful.  At best, the board's decision is ambiguous and not necessarily inconsistent with a finding of dishonesty.  It is clear from the board's decision only that it believed Monroe's misconduct to warrant demotion, not termination.  But the board's belief concerning an appropriate punishment is not adequate evidence of pretext.[54]  The board did not make the final disciplinary determination.  And the determination this Court must make—whether Khatib reasonably believed that a valid basis for discharge (including dishonesty) existed—is unaffected by the grievance board's findings.[55]

---

[53] *Macon*, 743 F.3d at 717.

[54] *See Kendrick*, 220 F.3d at 1233 ("A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct.")

[55] *See Macon*, 743 F.3d at 715 ("we focus on the motive of [the] final decisionmaker."); *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d 1267, 1270 (10th Cir. 2012) (rejecting as evidence of pretext testimony that a specific grievance panel member—not the final decisionmaker—doubted whether plaintiff's conduct supported termination).

*ii. Other Violations*

Monroe also disputes that he committed other misconduct cited by Khatib to support discipline. In this regard, Monroe denies that he violated the municipal court dismissal policy, accepted gratuities, and failed to warn MS against fixing citations for RJ. Apparently because of how he interprets the dismissal and gratuities policies, Monroe believes that he behaved appropriately. Monroe emphasizes that the dismissal policy covers complaints that have actually been filed in the Lawrence Municipal Court and thus did not apply to the unfiled citations that he dismissed for others. He admits, however, that he dismissed one ticket after it was filed with the municipal court. Still, he argues that he acted consistent with department custom (pre- and post-dating the dismissal policy) that permitted officers to regularly dismiss tickets for friends and family. Concerning gratuities, Monroe insists that certain athletic tickets given to him by KU employees were not gifts received in exchange for voiding citations because he paid some value for them. Alternatively, Khatib emphasizes that the dismissal policy's purpose is to ensure "cases be dismissed for good cause," requiring that any dismissal be based on an error in law or fact.[56] Khatib also explains that, even having given money for certain tickets, Monroe still accepted a benefit (athletic tickets and parking passes) not otherwise available to him from people for whom he previously performed a special service (dismissal of traffic citations).[57]

---

[56] The dismissal policy also states that "[i]t does not include citations or complaints voided by an officer . . . *based upon errors in law or fact* detected prior to the filing of the complaint with the Municipal Court."

[57] The gratuities policy states: "All personnel shall not accept, use, or retain any gratuity where the employee has performed . . . any special service for the person offering the gratuity." City policy defines "gratuity" as "[a]ny gift, sum of money, services, or discount on the purchase of goods or services not available to the general public." Khatib determined that the tickets and parking passes that Monroe received from persons for whom he had dismissed citations actually provided an aggregate value—comprised of a face value in dollars, a specific seating or parking location benefit value, and a ease of acquisition value—that differed from "other . . . forms of event access" available to a member of the public in Monroe's non-donor position.

Setting aside the fact that the dismissal policy clearly applied to at least one ticket voided by Monroe, the Court can "assume for purposes of summary judgment that these policies were ambiguous."[58]  But ambiguity is not sufficient evidence of pretext.[59]  "[T]he proper inquiry is whether [Khatib] honestly believed [Monroe] had violated [the City's] policy and acted in good faith upon that belief."[60]  Khatib considered and ultimately rejected Monroe's position that Monroe complied with the dismissal and gratuities policies.  Khatib directly responded to Monroe's position and even explained his own position in the disciplinary letters that he wrote concerning Monroe.  Khatib's interpretation of the dismissal and gratuities policies is "certainly not so unreasonable as to invite any inference of pretext."[61]  Even accepting that Khatib's decision to discipline Monroe somehow represents a departure from custom, courts must "afford substantial latitude to employers in making discipline related decisions."[62]  And for reasons ultimately discussed below, no evidence shows that Khatib adjusted his interpretation of the City's policies so that he could fire Monroe but continue to employee similarly-situated white

---

[58] *Bittel v. Pfizer, Inc.*, 307 F. App'x 132, 139–40 (10th Cir. 2009).

[59] *Dent v. Georgia Power Co.*, 522 F. App'x 560, 563 (11th Cir. 2013) ("the fact that an employer's decision . . .was based on a[] . . . policy subject to differing interpretations, without more, does not show that it was pretextual.").

[60] *Bittel*, 307 F. App'x at 140 (citing *Rivera*, 365 F.3d at 924–25).

[61] *Shirly v. Precision Castparts Corp.*, 726 F.3d 675, 683 (5th Cir. 2013) (emphasis removed).

[62] *Salguero*, 366 F.3d at 1177*; see also Kendrick*, 220 F.3d at 1234  ("Employers' disciplinary practices necessarily change over time, and it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time in an effort to better address their business needs."); *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 829 (7th Cir. 2008) (explaining that "even if [plaintiff's employer] had adopted an interpretation of the policy that was too strict, evidence that an employer is too hard on an employee or makes a poorly reasoned or mistaken decision cannot establish pretext.").

employees that engaged in the same misconduct.[63]  Accordingly, Monroe's interpretation of the court dismissal and gratuities policies fails to establish pretext.

Likewise, a reasonable juror could not infer pretext based on Monroe's assertion that he told MS that he should stop dismissing tickets for RJ.  Monroe's interview statements obscure the exact efforts that he undertook to supervise MS's interactions with RJ.  But the Court will assume, without deciding, that the evidence proves that Monroe unambiguously ordered MS to stop helping RJ avoid traffic tickets.  If Khatib had cited only the failure to give such a clear directive as the reason for faulting Monroe as a supervising officer, Monroe's evidence might create a factual dispute.  But Khatib disciplined Monroe, in part, for failing to actually end MS's improper conduct.  Khatib recognized that Monroe had some discussion with MS concerning MS's interactions with RJ.  He determined, however, that Monroe ultimately remained uncomfortable but abiding with MS's inappropriate behavior.  According to Khatib: Monroe withdrew from the situation; Monroe failed to discipline MS; Monroe permitted MS to continue his relationship with RJ; Monroe failed to notify others of MS's activities so that they could correct MS's behavior; and, all the while, Monroe knew enough facts that he should have understood MS's (and his own) behavior to violate City policy.  Khatib made these determinations based on a good faith review of Monroe's interviews.  The Court will not disturb Khatib's conclusion.  Ultimately, the Court is unable to conclude that Khatib's stated reasons for terminating Monroe are so false as to enable a reasonable factfinder to conclude that discrimination was a determinative factor in Monroe's termination.

---

[63] *See Braden v. Cargill, Inc.*, 176 F. Supp. 2d 1103, 1116 (D. Kan. 2001) (granting summary judgment where no evidence showed "that defendant . . . manipulated its interpretation of the single occurrence language to achieve plaintiff's termination based upon her gender."); *Guinto v. Exelon Generation Co., LLC*, 341 F. App'x 240, 247 (7th Cir. 2009) (explaining that consistent "misapplication" of policy does not prove pretext).

**b. Acts Contrary to Written Policy**

Monroe next argues that a reasonable jury may infer pretext because Khatib violated the City's progressive discipline policy when he decided to terminate Monroe (but not to discipline others).  "[D]isturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual."[64]  But "[t]he mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."[65]

Monroe's argument is really twofold.  On the surface, he argues that Khatib's non-progressive termination decision constitutes a disturbing procedural irregularity sufficient to prove that Khatib fired Monroe, at least in part, because of his race.  Nothing in the evidence, however, shows that the City inflexibly follows a policy *compelling* progressive discipline.  Rather, the City adheres to a policy that directs that "[d]isciplinary actions shall at all times be appropriate to the infraction committed, and generally progressive in nature.  However, some conduct may be serious enough to warrant more serious discipline including termination without progressive action."[66]  While Monroe emphasizes the policy's initial sentence and his generally unblemished disciplinary history, Khatib emphasizes the policy's final sentence and the severity of Monroe's ultimate misconduct.  The policy language clearly indicates that progressive discipline is not required in all cases.  Khatib apparently believed Monroe's misconduct to

---

[64] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007).

[65] *Randle*, 69 F.3d at 444 (emphasis in original).

[66] 4.13(B) Disciplinary Action Policy.

warrant more serious discipline, despite his favorable work history.[67]  And Monroe points to no other evidence that City policy required Khatib to discipline Monroe's behavior with less severe punishment.[68]  Thus, the Court, like many before it, considers Khatib's disciplinary decision to be within his discretion and inadequate proof of pretext.[69]

Tucked beneath any concern for procedural irregularity, Monroe essentially argues that Khatib applied the discretionary discipline policy based on race.  But, as discussed below, the evidence does not show that Khatib discriminately disciplined similarly-situated employees that committed conduct of comparable seriousness.

### c. Disparate Treatment of Comparable Employees

Finally, Monroe attempts to show pretext through evidence that Khatib deviated from customary practice.  "A plaintiff who wishes to show that the company acted contrary . . . to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."[70]  Here, Monroe seeks to prove deviation from company practice by providing evidence that Khatib disciplined him differently than similarly-situated, nonminority employees who violated work

---

[67] Contrary to Monroe's suggestion, Khatib's original decision to demote Monroe does not necessarily show that ultimately Khatib did not believe that Monroe's conduct was serious enough to warrant termination. Indeed, Khatib apparently believed that he could either demote or terminate Monroe based on Monroe's conduct before the third interview.  For reasons unrelated to Monroe's race, Khatib initially chose demotion.  But following that decision and Monroe's final interview, Khatib considered Monroe guilty of additional policy violations beyond those cited to justify demotion; he altered Monroe's discipline according to this belief.

[68] Indeed, the City's disciplinary action policy explains that "[r]easons for dismissal may include . . . : 3. neglect of duty . . . [;] 7. untruthfulness . . . [; and] 9. [a]ny act contrary to good order and discipline, or constituting a violation of the rules, regulations, duties, or provisions of this manual or city rules and regulations."

[69] *See, e.g.*, *Lobato v. New Mexico Env't Dept.*, 733 F.3d 1283, 1289–91 (10th Cir. 2013) (quoting *Timmerman*, 483 F.3d at 1120) ("And where 'progressive discipline [is] entirely discretionary,' and the employer 'did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext.' ").

[70] *Kendrick*, 220 F.3d at 1230.

-24-

rules of comparable seriousness. Monroe describes four white officers (White Officer 1, White Officer 2, White Officer 3, and White Officer 4) and one white sergeant (MS). Each of these white employees allegedly dismissed traffic citations for and used athletic tickets provided by KU employees. Others (White Officer 2, White Officer 4, and MS) allegedly engaged in untruthful conduct. And, allegedly, Khatib failed to demote, dismiss, and, more often than not, discipline in any way these white employees; but Khatib demoted and then terminated Monroe.

*i. White Nonsupervisory Police Officers*

An employee outside the plaintiff's protected class is similarly situated if "the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline."[71] "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated."[72] Initially, the parties dispute whether Monroe's supervisory position as a sergeant *automatically* differentiates him from nonsupervisory police officers. Defendants point to the Tenth Circuit's statement that "[u]nder our precedent, employees may not be 'similarly situated' when one is a supervisor and the other is not."[73] Monroe counters that the Tenth Circuit's statement is a *per se* rule of exclusion that the Court cannot apply. Monroe credits *Sprint/United Management Co. v. Mendelson* as support.[74] The preclusive effect of *Mendelson* is not entirely apparent to the

---

[71] *Macon*, 743 F.3d at 718 (internal quotation marks and citation omitted).

[72] *Kendrick*, 220 F.3d at 1232 (quotation omitted).

[73] *Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001).

[74] 552 U.S. 379, 387–88 (2008).

Court.[75]  That said, it is also uncertain whether the Tenth Circuit intended to create a *per se* rule that pretext is *never* inferable from evidence that an employer treated more harshly a supervisor-plaintiff than other nonsupervisory employees.  The Court, however, need not look only to Monroe's job title to determine that he is not similarly situated to nonsupervisory police officers.

A review of the City's policies demonstrates that it expects more of its supervisory personnel.  "The distinction between supervisors and non-supervisors is clearly relevant to whether we would expect . . . employees . . . to be treated the same in the absence of discrimination.  An employer who entrusts greater authority to its supervisors than to ordinary employees surely can be expected to exact greater responsibility from them."[76]  Many of the policies that Monroe allegedly violated apply to all police personnel, regardless of rank.  But not all.  And if those policies create an expectation that the City regards supervisors differently, then it reasonably could treat its supervisors differently than nonsupervisory employees of like experience.

---

[75] In *Mendelson*, the Supreme Court evaluated a district court's decision to exclude certain evidence in an age discrimination suit.  Sprint argued in its motion in limine that the district court should exclude the testimony of certain older employees that had different supervisors than the plaintiff because, under *Aramburu v. Boeing Co.*, 112 F.3d 1398 (10th Cir. 1997), they were not "similarly situated."  *Aramburu* explained that employees who "deal with the same supervisor" may be similarly situated.  *Id.* at 1404.  With little explanation, the district court granted Sprint's motion.  *Mendelson*, 552 U.S. at 381–83.  Unable to determine whether the district court applied a per se rule of exclusion under Federal Rules of Evidence 401 and 403, the Supreme Court remanded the case with instructions that the district court clarify its decision.  The Supreme Court also explained that Federal Rules of Evidence 401 and 403 disfavor per se rules of exclusion.  *Id.* at 387–88.

This Court does not understand why the Supreme Court's admonition against *presumptively* excluding a witness' testimony without explaining the basis for wholesale exclusion necessarily prohibits this Court from deciding that Monroe is not similarly situated to other nonsupervisory officers based solely on the fact that he is a supervisor.  If as a matter of law evidence rebuts a claim, *Mendelson* does not direct that a district court must disregard such evidence.  *Mendelson* merely underscores the district court's obligation to make a "fact-intensive, context-specific inquiry" and explain its determination.  *Id.* at 388.  Even if this Court were to interpret *Mendelson* to affirm the relevance of "evidence of discrimination by other supervisors" against employees within plaintiff's protected class, Monroe does not pursue a finding of pretext with evidence of discrimination against others in his protected class.  *Id.*  Instead, Monroe offers evidence that Defendants treated more favorably nonsupervisory white employees than a black supervisor, and the parties dispute this evidence's legal significance.

[76] *Watts*, 270 F.3d at 1294.

Two policies specifically speak to supervisory personal.  First, ethical standards principle one, concerning responsibility, specially admonishes that, "Officers in a command or supervisory position carry out their duties in a manner, which is consistent with the highest degree of professional effectiveness, efficiency, and responsibility."  Second, the City's disciplinary action policy directly charges supervisory personnel "with the responsibility of ensuring correct employee behavior."  The policy also anticipates that "supervisors may be required to discipline employees" and "must follow the course of action that: [i]s most beneficial to the welfare of the citizens of Lawrence[; p]reserves the efficiency and integrity of the department[; and g]ives the employee, when possible, the opportunity to learn for his/her mistake and improve."

This disciplinary responsibility is further underscored by Monroe's formal job description.  As a police sergeant, the City hired Monroe to perform essential duties and responsibilities.  The City expected him to "[r]eview the work of department personnel to ensure compliance with department policies and procedures" and to "work with employees to correct deficiencies; implement discipline procedures; [and] instruct . . . staff regarding applicable policies, procedures and tactics."  This City also expected Monroe to be competent to perform these duties.  A qualified police sergeant knows and follows "department rules and regulations;" s/he has the ability to "[s]upervise, organize, and review the work of . . . personnel;" and s/he can "[a]nalyze situations and adopt effective and appropriate courses of action."

Khatib relied on these performance standards in considering Monroe's actions.  In his demotion decision, Khatib echoed the City's expectation that experienced supervisors act with the highest degree of professional competency:

> Before proceeding, I feel it is important to share with you the lens through which I look at your behavior.  You have been a Sergeant with the Department for eight years.  You have had numerous trainings and experience that reinforced

> your role as a supervisor and I am holding you to a higher standard as such.  Your
> role as a leader, a teacher, and a gatekeeper is critical.

Then, in addition to other policies that impacted his examination, Khatib quoted the above-discussed disciplinary action policy and police sergeant job descriptions.   And in his grievance board submission, Khatib cited the same performance standards and again explained, "Monroe was a supervising Sergeant.  He had served in that position for 8 years.  Accordingly, then-Sgt. Monroe was held to a higher standard due to his role as a leader, a teacher, and a gatekeeper."

Taken together, Khatib's statements show that, as stated at his deposition, he believed that the City imposed "a higher expectation for those people in supervisory roles, and that includes any kind of policy violation as well as dishonesty or things that are similar to that behavior."  The Court's independent review of these policies does not show Khatib's belief to be so unreasonable as to invite the conclusion that it was not honestly held.  Because Khatib believed that different standards governed performance evaluation and discipline of supervisory personnel, Monroe is not similarly situated to the nonsupervisory white officers.

Alternatively, the evidence does not show that the nonsupervisory white officers' violated work rules of comparable seriousness.[77]   Khatib's determination that Monroe violated supervisor-specific policies and job descriptions alone suggests that Monroe violated work rules different in quantity and quality than those arguably violated by the four white officers.  But Khatib also determined that to the extent these white officers violated the same gratuities, complaint dismissal, or truthfulness policies as Monroe, they less frequently violated those policies.  So Khatib deemed Monroe's list of generally forbidden misconduct to be longer and

---

[77] *Whalen*, 1992 WL 180124, at *2 ("The burden is on the plaintiff to show the similarity between [his] conduct and that of [other nonprotected] employees who were treated differently.").

thus more serious than each nonsupervisory white officers' conduct.  The white officers' overall misconduct is too dissimilar to similarly situate them with Monroe.[78]   Any difference in treatment between Monroe and those white officers, therefore, does not support an inference of pretext.

*ii. White Police Sergeant*

Monroe does, however, provide evidence that MS, a white sergeant, committed arguably comparable or more egregious misconduct but received less severe discipline.  For the purposes of summary judgment, the Court will assume Monroe and MS are similarly situated.  Monroe claims that Khatib overlooked MS's misconduct during the 2010 investigation.  But Khatib's actions during the 2010 investigation are not at issue.[79]

Monroe also argues that when Khatib ultimately punished MS following the 2011–2012 investigation, Khatib permitted MS to resign.  Monroe claims that Khatib never provided him the option to resign and thus receive severance pay and other benefits.  Importantly, however, Monroe does not provide facts showing that he attempted to resign.[80]   The Court agrees that it cannot find an instance before or within Khatib's termination letter where Khatib offered resignation in lieu of termination.  But the evidence also does not clearly show that City policy required Khatib to make such an offer and, more importantly, that MS received a resignation

---

[78] *See Salguero*, 366 F.3d at 1176–77 (considering plaintiff-officer's conduct more serious than other officers involved in the same "illegal satellite access scheme").

[79] The record indicates that at the time of the 2010 investigation Ron Olin, not Khatib, acted as chief of police and thus was the final decisionmaker responsible for discipline at the time.  Additionally, Monroe does not provide adequate evidence to show what facts supporting misconduct Khatib (or any other decisionmaker) actually knew in 2010. *See Macon*, 743 F.3d at 719–20 (explaining that the decisionmaker must have "specific knowledge" of the comparable employee's misconduct to be similarly situated).

[80] *See Becker v. Omni Air Int'l, Inc.*, 2014 WL 1394193, at *9 (N.D. Okla. Apr. 9, 2014) (rejecting as evidence of pretext plaintiff's contention that her employer treated her different than a male employee who was permitted to resign prior to termination because plaintiff did not attempt to resign).

offer from Khatib in MS's termination letter.  Instead, the evidence merely shows: MS resigned to avoid termination; in Monroe's response to Khatib's termination letter, Monroe pointed out that MS was permitted to resign but firmly declared: "I am not asking for an opportunity to resign, and I have no intention of resigning;" and, Monroe confirmed at his deposition that he never told anyone that he wanted to resign.  On the evidence presented, therefore, the difference in treatment is explained by Monroe's insistence that he would not accept an offer to resign even if made.  The Court cannot infer that Khatib willfully withheld a resignation offer from Monroe because of his race.  And, even if the facts showed otherwise, Monroe provides no authority that pretext may be inferred from evidence that an employer terminated a minority employee but merely forced a similarly culpable, nonminority employee to resign in lieu of termination.  Thus, MS's resignation is no evidence of pretext.[81]

"Merely finding that people have been treated differently stops short of the crucial question: *why* people have been treated differently."[82]  Monroe's evidence shows that Khatib treated him differently that other white employees.  But his evidence does not, as it must, show that an unlawful motive explains the difference in treatment.  Unable to meet his burden to show pretext, the Court grants Defendants summary judgment on each of Monroe's race discrimination claims and denies Monroe's respective cross-motion for summary judgment.

**B. Deprivation of Liberty Interest Without Due Process of Law under 42 U.S.C. § 1983**

Monroe also asserts that the City impaired his constitutional rights without due process when it discharged him without providing an adequate name-clearing hearing before an impartial

---

[81] *Kendrick*, 220 F.3d at 1232 ("Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext.").

[82] *Flasher*, 986 F.2d at 1321 (emphasis original).

tribunal.  No state may "deprive any person of life, liberty, or property without due process of law."[83]  For the Fourteenth Amendment's procedural due process protection to apply, however, a state caused deprivation must impair a "protected interest."[84]   Monroe only claims the impairment of a liberty interest.  Specifically, Monroe insists that, as a public employee, the circumstances of his termination violated his "good name, reputation, honor, and integrity" as well as his "freedom to take advantage of other employment opportunities," which are both protected interests.[85]  To state a claim for the deprivation of these liberty interests, Monroe must prove "governmental defamation and . . . an alteration in legal status."[86]  More exactly, Monroe must show that: (1) the City made a statement impugning his good name, reputation, honor, or integrity; (2) the statement was false; (3) the statement occurred during the course of his termination and will foreclose other employment opportunities; and (4) the statement was published.[87]

## 1. Statements to Media

The City terminated Monroe following a series of investigations surrounding an anonymous allegation that improper "quid pro quo" arrangements existed between certain KU Athletic Department employees and members of the LPD.  Monroe contends that publicity accompanying the investigations created the false impression that he engaged in unacceptable conduct.  Specifically, Monroe identifies nine media statements as false and stigmatizing.  Five

---

[83] U.S. Const. amend. XIV, § 1.

[84] *Nard v. City of Okla. City*, 153 F. App'x 529, 533 (10th Cir. 2005).

[85] *Parker v. Town of Chelsea*, 275 F. App'x 769, 773 (10th Cir. 2008) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).

[86] *Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012).

[87] *See, e.g.*, *id.*; *Bjorklund v. Miller*, 467 F. App'x 758, 767 (10th Cir. 2012).

of the statements are attributed to City of Lawrence officials in a February 16, 2012 *Lawrence*

*Journal-World* article:

> City leaders have confirmed two Lawrence police officers were suspended
> following an investigation conducted by the FBI related to traffic tickets being
> fixed in exchange for Kansas University basketball tickets.
> . . . .
> City officials said the personnel review process is ongoing because the actions of
> dismissing speeding tickets in exchange for the KU basketball tickets violated the
> city's gratuity policy.
> . . . .
> Mayor Aaron Cromwell said one of the suspended individuals orchestrated the
> dismissal of the tickets, while the other is an individual who had knowledge of the
> activity and did not step forward.
> . . . .
> Khatib—who was not chief at the time [of a similar prior anonymous tip]—said
> his understanding is those allegations were examined but there was never enough
> evidence to take more formal action.
> . . . .
> "This worked.  The information came in anonymously.  It was jumped on
> vigorously, and people are going to be held accountable," Khatib said.

One of the statements is attributed to City of Lawrence officials in a February 21, 2012

*Lawrence Journal-World* article: " 'I don't think the public needs to worry here that we're

talking about a ton of tickets,' Khatib said.  'This is not a widespread, systematic amount of

officers.  I can tell you that.  It is not that huge of an amount.' "  The remaining three identified

statements come directly from media releases issued by Defendant Khatib:

> The Lawrence Police Department received an anonymous letter in reference to
> Lawrence Police Officers being involved with dismissing traffic tickets in
> exchange for Kansas University Athletic Event tickets.  The complaint was
> received in May 2011.
> . . . .
> In May of 2011, the Lawrence Police Department received an anonymous
> complaint alleging Lawrence Police Officers were involved with fixing tickets in
> exchange for Kansas University Athletic Event tickets.  The Lawrence Police
> Department initiated a personnel investigation of the allegations immediately.
> . . . .
> During the course of events, the commissioned [LPD] employee asked a second
> commissioned [LPD] employee two to three times for assistance in the fixing of

the citations.  This second employee may have been the beneficiary of KU Athletic event tickets through the first employee.  The other citations were fixed by asking the officers that issued or were about to issue a citation to void or to not issue it.  The requests to those officers were conveyed as a favor for the two commissioned employees and not one in which the issuing officer knowingly received anything in return.

Various other *Lawrence Journal-World* articles contain statements similar to those particularly identified.  Monroe argues that, considered in context, individually and collectively, the City's statements create the false impression that he "is a 'crooked cop' who was investigated by the FBI and who fixed traffic tickets in exchange for KU athletic tickets, and that when City officials learned of [his] conduct, they disapproved and immediately took action."

The Court has carefully considered, individually and collectively, what the City's statements say about Monroe.  What the statements do not say, however, says more about Monroe's due process claim than what is said.  Importantly, the *Lawrence Journal-World* statements attributed to the City do not identify Monroe by name.  Whether a statement fairly may be characterized as stigmatizing depends on the "many controlling factors" identified by the Tenth Circuit in *Melton v. City of Oklahoma*.[88]  Particularly important is the defendant's responsibility for creating a defamatory impression.[89]  The Tenth Circuit explained that "the significance of this fact" is underscored by the Supreme Court's pronouncement that

> [o]*nly if the employer creates* and disseminates a false and defamatory impression about the employee in connection with his termination is [a name-clearing] hearing required. . . .  If there is a "bottom line," . . . it is [the Supreme Court's] use of the conjunctive requiring the employer to "create and disseminate[]" the false impression.[90]

---

[88] *Melton v. City of Oklahoma (Melton II)*, 928 F.2d 920, 928 (10th Cir. 1991).

[89] *See Russillo v. Scarborough*, 935 F.2d 1167, 1171–72 (10th Cir. 1991) (identifying as a controlling factor in *Melton II* that "the police department was not the original source of the potentially stigmatizing information.")

[90] *Melton II*, 928 F.2d at 928 n.12 (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977)).

However Monroe characterizes the City's statements, he offers no evidence to show that the City ever directly associated *his* "good name, reputation, honor, or integrity" with public charges of misconduct.[91]  Whatever impression the *Lawrence Journal-World* articles make, therefore, the Court cannot fairly say that the City's statements create a defamatory impression specifically about Monroe.

The Court reaches this conclusion even accepting that the City knew reporters had Monroe's name.  On February 15 (one day before Khatib's first media release), a reporter from the *Lawrence Journal-World* requested by email that Khatib confirm certain information.  The reporter solicited comment on a unnamed "tipster['s]" report that the City suspended and likely would fire Monroe for participation in "fraudulent activity."  Monroe interprets this email as proof that the City made its subsequent remarks to the media with some culpable state of mind.  Actually, Monroe's analysis stops one step short at the unexplained conclusion that "City officials . . . knew the local media had Monroe's name and connected it with 'fraudulent activity.' "  The legal significance of Monroe's unexplained conclusion is not apparent to the Court.[92]  Monroe offers no authority that requires the Court to conclude that statements not specifically identifying the plaintiff ought to be understood as impugning the plaintiff simply because the statements were made with knowledge that the recipient-publisher (not the general public) might interpret the statements in light of independently gathered information to concern

---

[91] Monroe's own conclusory statements that the articles concern him, of course, are insufficient evidence to create a genuine issue of material fact.  *See Parker*, 275 F. App'x at 773.

[92] A speaker's state of mind may alter its liability for a literally true statement that, in context, creates a false impression in the mind of the average reader.  *Melton II*, 928 F.2d at 929 n.14 (the "distinction between those [literally true, but misrepresentative] reports which are actionable and those which are not is what the reporter intends and what the average reader perceives from the report.").  But no authority regards a speaker's state of mind as relevant to any inquiry other than whether the speaker intended its technically true remarks to create a *false* impression.  After all, a statement that in fact does not stigmatize a particular person cannot suddenly become stigmatizing because the speaker wills it so.

-34-

the plaintiff.  The only evidence offered, moreover, demonstrates that the City consistently protected Monroe's anonymity.[93]  Legally relevant or not, the City's mental state surrounding its statements affords Monroe's position no support.

Likewise, the fact that the City confirmed Monroe's employment status alters nothing. On March 22, 2012, Khatib confirmed to the *Lawrence Journal-World* that "the second employee no longer works for the city."  That same day, Corliss confirmed that the City no longer employed Monroe, but declined to identify Monroe as connected with the ticket-fixing investigation.  Following these statements, the *Lawrence Journal-World* for the first time published Monroe's name in connection with the LPD's investigation.  The March 22 article implied but did not positively recognize Monroe to be the second officer discussed in previous articles.[94]  A March 30 *Lawrence Journal-World* article did specifically recognize Monroe as the second officer, but also noted the City's refusal to identify the two officers.[95]

---

[93] Without exception, the City refused to associate Monroe's name with the LPD investigation and crafted its public statements to protect Monroe's anonymity. *See, e.g.*, February 16, 2012 *LJ-World* Article ("City officials did not release the names of the two suspended police officers, saying it was a personnel matter."). Monroe has not seen an article predating his termination where City disclosed his name.

[94] "The second Lawrence police officer who was suspended related to an internal traffic ticket-fixing investigation is no longer employed with the city, Police Chief Tarik Khatib said Thursday.
'As this still is a personnel matter, we will not identify the person or comment further,' Khatib said.
But City Manager Corliss did confirm, when asked by the Journal-World, that Sgt. Michael Monroe was no longer employed by the City of Lawrence.  Monroe left the city's employment Wednesday.  Corliss declined to comment on whether Monroe was the second Lawrence police officer suspended in connection with the ticket-fixing investigation.  Corliss did not provide any details about Monroe's departure from the city, where he had been employed in the Police Department since 1991." March 22, 2012 *LJ-World* Article.

[95] "Two officers were suspended earlier this year, and neither is now employed with the police department. . . .
The city has not identified the two officers, but city officials have confirmed that [MS] and Michael Monroe, both sergeants and longtime officers, are no longer employed with the department.
When asked on Friday whether the active cases reviewed [for *Brady-Giglio* compliance] involved [MS] and Monroe, [Douglas County District Attorney Charles] Branson said they did.
. . . .
The second officer—Monroe, who was suspended and was no longer employed with the city as of last week—was asked two or three times by [MS] for assistance in fixing a ticket and may have benefited from KU tickets obtained by [MS]." March 30, 2012 *LJ-World* Article.

-35-

Again, the City's statements fall short of impugning Monroe. Apart from posing the defects discussed above, the City's employment-status comments say no more about Monroe than was said of Frederick Russillo in *Russillo v. Scarborough*.[96] The Tenth Circuit rejected Russillo's liberty interest deprivation claim.[97] Specifically, the Tenth Circuit concluded that "defendants did not disseminate any false and stigmatizing charges against Mr. Russillo" because "[a]ny possible impression that Mr. Russillo was fired for financial wrongdoing was created by the newspaper's juxtaposition of . . . information [about Russillo's termination] with news about missing funds, not by [defendant's] comments."[98] Any insinuation that Monroe misbehaved is attributable to the *Lawrence Journal-World*'s juxtaposition of Khatib and Corliss' remarks with previously gathered information, not the remarks alone. It is not enough that a defendant disseminate information that would allow a savvy journalist to print statements implying plaintiff's participation in stigmatizing conduct; the statements must "charge" plaintiff with stigmatizing conduct.[99] Accordingly, Monroe's liberty interest in his reputation remains unaffected by the City's March 22 statements.

Ultimately, a speaker must directly associate false information with a particular person's identity before its statements may impugn. The importance of associating false information with a particular person's identity is supported by a survey of authority and logic. In fact, the importance of this connection is so basic that the Court has yet to discover a liberty interest claim

---

Monroe does not attribute the *Lawrence Journal-World*'s positive identification to the City or dispute that an official other than Branson directly associated Monroe with the investigation.

[96] *Russillo*, 935 F.2d at 1172.

[97] *Id.*

[98] *Id.*

[99] *See Melton II*, 928 F.2d at 930.

asserted in this circuit that does not include evidence that defendant named or effectively named plaintiff.[100] This result is hardly surprising. "A claim that the government has violated the Due Process Clause by impugning a plaintiff's reputation (a 'stigma-plus' claim)" cannot succeed without proving "governmental defamation."[101] And a defamatory statement, after all, must operate "to injure the reputation *of the person referred to in it*."[102] Similarly, an impugning statement must "challenge or call into question . . . a *person's* character . . . with arguments, accusations, or imputations of incorrectness."[103] The constitutional right that Monroe seeks vindication for is personal,[104] and so too is the remedy.[105] Alone, a statement unassociated with a specific person's name cannot operate to injure the actual subject's reputation. And a name-clearing hearing is unnecessary to exonerate an unnamed party. Even assuming that the City spread false and impugning charges, Monroe can only prove that the City's charges impugn "the second officer." The Court does not understand the very real procedural protections of the Due

---

[100] *See, e.g.*, *McDonald v. Wise*, 769 F.3d 1202, 1209 (10th Cir. 2014) (statement named plaintiff); *Bjorklund*, 467 F. App'x at 762–63, 767 (statement direct response to plaintiff's public statements); *McCarty v. City of Bartlesville*, 8 F. App'x 867, 873–74 (10th Cir. 2001) (statements named plaintiff); *Renaud v. Wyo. Dept. of Family Servs.*, 203 F.3d 723, 726 (10th Cir. 2000) (statement named plaintiff).

[101] *E.g. Nixon v. City and Cty. of Denver*, 784 F.3d 1364, 1368 (10th Cir. 2015); *see also Guttman*, 669 F.3d at 1125.

[102] *Defamatory Statement*, Black's Law Dictionary (10th ed. 2014) (emphasis added).

[103] *Impugn*, Black's Law Dictionary (10th ed. 2014) (emphasis added).

[104] *See West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000) (quoting *Los Angeles Police Dept. v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999)) (identifying "two 'cardinal principles' of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication").

[105] *See Wise*, 769 F.3d at 1213 (quoting *Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir. 2004)) (emphasis added) ("When an employee's liberty interest is infringed upon, *he* must receive an adequate name-clearing hearing;" such a remedy " 'gives the plaintiff an opportunity to hear and answer firsthand any stigmatizing charges, clearing *his* name of any false statements *made about him*, and curing the injury *to his* reputation' ").

Process Clause to extend to an anonym's imagined reputation. And so the Court declines Monroe's invitation to create liability for the City's impersonal media remarks.

**2. Statement to KS-CPOST's Central Registry**

In addition to the media statements, Monroe claims that the City impaired his liberty interest by sending to the central registry of the Kansas Commission on Peace Officers' Standards and Training ("KS-CPOST") a letter explaining the basis for his termination. The letter reports:

> An investigation was conducted into an allegation of tickets being dismissed in exchange for Kansas University Athletic Event Tickets. Mr. Monroe was one of the officers being investigated and as such was suspended pending the outcome of the investigation.
> During the course of the investigation, Mr. Monroe was untruthful with investigators. Mr. Monroe was terminated at the conclusion of the investigation.

To prove that the LPD's termination report to KS-CPOST violated Monroe's liberty interest Monroe must, as before, show that: (1) the report impugned his good name, reputation, honor, or integrity; (2) the report was false; (3) the report occurred during the course of his termination and will foreclose other employment opportunities; and (4) the statement was published.[106]

Monroe provides sufficient evidence to create a factual dispute concerning the first three elements. First, "unfounded charges of dishonesty" are sufficient to impugn.[107] The City's report clearly accuses Monroe of dishonesty and thus impugns his good name. Second, the evidence that Monroe "was untruthful with investigators" is not beyond dispute. The evidence, as discussed above, is certainly clear enough to conclude that the City *honestly believed* that Monroe was untruthful, but the evidence is not so clear as to make the *fact* of Monroe's

---

[106] *See, e.g.*, *Guttman*, 669 F.3d at 1125.

[107] *Melton II*, 928 F.2d at 927.

(dis)honesty certain.  Third, as statutorily required, the City issued the report within 30 days of the effective date of Monroe's termination and during the course of Monroe's grievance process; thus, the report occurred during the course of his termination.[108]  Additionally, Monroe presents evidence creating a genuine factual issue as to whether the City's report—now included in his KS-CPOST file and "available to any law enforcement agency to which [he,] the terminated officer[,] later applies"[109]—forecloses employment opportunities.[110]

So the specific survival of Monroe's termination report-based due process claim depends on whether the City's statement to KS-CPOST constitutes "publication."  Resolving this legal issue embraces two related considerations. The first consideration: K.S.A. § 74-5611a(d) and (e) compels the City to "include a report explaining the circumstances under which the officer . . . was terminated" and endeavors to make the reporter of that information "absolutely immune from civil liability."  Accordingly, the City originally argued immunity for its actions.  But the Supreme Court's pronouncement that "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law" strongly opposes immunity.[111]  And, in light of this authority and discussion at the parties' July 31, 2015 motions hearing, the City abandoned its reliance on K.S.A. § 74-5611a's immunity provision.

That leaves the second consideration: whether the disclosure required under K.S.A. § 74-5611a(d) constitutes "publication" or, rather, "intra-government dissemination."  "[I]ntra-

---

[108] *See Renaud*, 203 F.3d at 727 ("examining the nature of the alleged defamation, as well as its timing, to determine whether it occurred in the course of the termination.").

[109] K.S.A. § 74-5611a(d).

[110] *See Melton II*, 928 F.2d at 927 n.11.

[111] *Martinez v. State of California*, 444 U.S. 277, 284 n.8 (1980); *see also Palmer v. City of Monticello*, 31 F.3d 1499, 1503–04 (10th Cir. 1994) ("We are persuaded that . . . a state libel and slander law privilege may not limit a cause of action for deprivation of a constitutionally protected liberty interest.").

government dissemination, by itself, falls short of the Supreme Court's notion of publication: 'to be made public.' "[112] Because "stigmatizing information must be *made public* by the offending government entity" to impinge on a liberty interest, nonpublic intra-government dissemination is not actionable.[113] The City argues that the circulation of a termination report from a Kansas law enforcement agency to KS-CPOST amounts to involuntary, nonpublic, intra-government dissemination.[114] Conversely, Monroe argues that the same circulation amounts to publication because KS-CPOST makes the termination report available to prospective employers.[115]

The legal character of the City's report is unsettled. The Tenth Circuit has not yet considered whether public dissemination occurs when a government employer makes a mandatory disclosure to a separate government agency. Also, the circuit's "intra-government dissemination" authority is underdeveloped.[116] Elsewhere, circuits disagree as to when

---

[112] *Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984) (citing *Bishop v. Wood*, 426 U.S. 341, 348 (1976)).

[113] *Rich v. Sec'y of the Army*, 735 F.2d 1220, 1227 (10th Cir. 1984) (emphasis added).

[114] At the parties' July 31, 2015 motions hearing, Defendants provided Sixth Circuit authority that, unlike any other circuit, requires *voluntary* dissemination as an element to prove impairment of a liberty interest. *See Kendall v. Bd. of Educ. of Memphis*, 627 F.2d 1, 5 (6th Cir. 1980). Though the Tenth Circuit has discussed *Kendall*, its discussion does not indicate to this Court that it should apply the Sixth Circuit's *voluntary* dissemination requirement (particularly when that application would effectively raise state law above constitutional rights). *See Palmer*, 31 F.3d at 1503–04. After all, K.S.A. § 74-5611a may require law enforcement agencies to provide a termination report, but it does not require them to provide a false and stigmatizing report without affording the terminated officer appropriate due process.

[115] *See* K.S.A. 74-5611a(d) ("Such termination report shall be available to the terminated officer and any law enforcement agency to which the terminated officer later applies for a position as a police officer or law enforcement officer.").

[116] No precedent clearly defines "intra-government dissemination." The Tenth Circuit has applied the "intra-government dissemination" label in only a handful of cases. In five of those cases, the dissemination (1) occurred in furtherance of the internal business of the plaintiff's former public employer and (2) the impact of the alleged defamation was limited to affecting plaintiff's reputation with his/her current public employer. *See Sky Harbor Air Servs., Inc. v. Reams*, 491 F. App'x 875, 887 (10th Cir. 2012); *Lollis v. City of Eufaula*, 249 F. App'x 20, 25 (10th Cir. 2007); *Custodio v. Parker*, 1995 WL 523123, at *4 (10th Cir. Sept. 6, 1995); *Harris v. Blake*, 798 F.2d 419, 422 n.2 (10th Cir. 1986); *Asbill*, 726 F.2d at 1503. These cases suggest that "intra-government" be understood as a term of art to cover "intra-employer" communications. Under this meaning, the City's termination report would be considered published.

dissemination becomes "public."[117]  Even this Court has come to conflicting conclusions on the significance of obligatory termination reports.[118]  But here, the Court can assume that the City published the KS-CPOST termination report and decide Monroe's remaining due process claim on the basis that he received an adequate name-clearing hearing.[119]

### 3. Due Process

Due process demands that a liberty deprivation be accompanied by an adequate name-clearing hearing.[120]  A name-clearing hearing must conform to the Due Process Clause's "fundamental requirement" that the plaintiff receive notice and an opportunity to be heard "at a meaningful time and in a meaningful manner."[121]  "The opportunity to be heard at a meaningful time and in a meaningful manner includes: (1) an impartial tribunal; (2) notice of the charges

---

However, in the remaining cases, the Tenth Circuit applied the "intra-government dissemination" label to dissemination that occurred between separate government agencies—one the plaintiff's employer, the other not—engaged in different functions.  *See McCarty*, 8 F. App'x at 874; *Six v. Henry*, 42 F.3d 582, 586 (10th Cir. 1994).  As applied in those cases, "intra government" is less a term of art and more literally construed to cover communication between public agencies regardless of their specific relationship to plaintiff's former employer.  Under this meaning, the City's termination report would qualify as "intra-government" dissemination.

[117] *See* Katherine Crytzer, *You're Fired! Bishop v. Wood: When Does A Letter In A Former Public Employee's Personnel File Deny A Due Process Liberty Right?*, 16 Geo. Mason. L. Rev. 447, 456–460 (2009) (examining the competing views of publication).

[118] *Compare Winger v. Meade Dist. Hosp.*, 2015 WL 2445834, at *7 (D. Kan. Mar. 9, 2015) (explaining that the "limited, mandatory reporting" of information by a hospital-employer to the state board of healing arts "is not 'publication' sufficient to trigger a liberty interest claim," even though prospective employers may access that information through the National Practitioner Data Bank), *with Michaels v. City of McPherson*, 2014 WL 3107966, at *5 (D. Kan. July 7, 2014) (distinguishing the Tenth Circuit's intra-government dissemination authority because "the fact that the KS-CPOST report is available to any law enforcement agency (and not just the City of McPherson Police Department) to which plaintiff applies . . . makes this case different.").

[119] Because the Court finds the City's grievance process constitutionally adequate, it also need not address whether the KS-CPOST statute itself provides Monroe a sufficient name-clearing opportunity.  *See* K.S.A. § 74-5611a(d) ("The terminated officer may submit a written statement in response to the termination and any such statement shall be included in the registry file concerning such officer.").

[120] *Wise*, 769 F.3d at 1213.

[121] *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009).

within a reasonable time before the hearing; and (3) absent emergency circumstances, a pretermination hearing."[122]  However, "a name-clearing hearing may be constitutionally adequate even if it occurs after publication."[123]  Essentially, the state actor must allow plaintiff the "opportunity to hear and answer firsthand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation."[124]

**a. Notice and Hearing**

The City's grievance process afforded Monroe adequate notice of and occasion to rebut the allegations against him.  In fact, the multi-step grievance procedure used by Monroe is nearly indistinguishable from the process approved by the Tenth Circuit in *Riggins v. Goodman*.[125]  The Louisville, Colorado Police Department fired Jerry Riggins from his police sergeant position.  Riggins received a "notification of a decision to terminate at a future date along with the reasons for termination, followed by a three-step [appeals] process designed to give several layers of review."[126]  At the first, post-decision step, Riggins appealed his termination decision to the department head (chief of police) that originally recommended his discharge.  After a hearing, the chief upheld his original decision.  At the second, post-decision step, Riggins appealed the chief's decision to Louiville's human resources manager.  When the human resources manager also recommended Riggins' termination, Riggins made one final appeal.  At this third, post-decision step, the city manager conducted a hearing and approved termination.  The Tenth

---

[122] *Melton v. City of Okla. (Melton I)*, 879 F.2d 706, 721 (10th Cir. 1989).

[123] *Rankin v. Indep. Sch. Dist. No. I-3*, 876 F.2d 838, 842 (10th Cir. 1989).

[124] *Wise*, 769 F.3d at 1213 (quoting *Patterson*, 370 F.3d at 335).

[125] 572 F.3d 1101.

[126] *Id.* at 1111.

Circuit announced that this procedure "more than adequately satisfied due process requirements."[127]

Monroe received equally adequate (if not superior) due process through a near identical grievance review procedure.  On March 7, 2012, Monroe received a notification of Chief Khatib's decision to terminate Monroe's employment effective March 22, 2012.  The letter explained Khatib's basis for changing Monroe's discipline from demotion to termination.  On March 21, 2012, Khatib and Monroe met one final time so that Monroe could present information in support of the reasons why he should not be discharged.  Following that step-one meeting, Khatib submitted his employment decision for approval.  City Manager Corliss approved Monroe's termination, effective March 22, 2012.  Monroe then initiated the City's grievance process.  According to the next step of that process, Khatib reconsidered the circumstances supporting Monroe's dismissal, and he again recommended termination in written decision.  At the following step, a grievance review board spent four days reexamining Khatib's decision.  The grievance board found evidence of misconduct worthy of demotion.  Both Khatib and Monroe appealed.  At the final grievance review step, Corliss reviewed the grievance board's decision.  Ultimately, Corliss considered dismissal rather than demotion appropriate.

At each step of this process, the City allowed Monroe to rebut—in writing and orally at an in-person meeting with the designated decisionmaker—the allegations and evidence against him.  In total, Monroe prepared five letters and attended five meetings opposing the charges against him.  Though only three of these meetings occurred before the effective date of Monroe's termination, the pre-termination and post-termination process afforded Monroe is not so

---

[127] *Id.* at 1109.

dissimilar from the procedure that adequately protected Riggins' property interest that the Court should consider it inadequate to protect Monroe's liberty interest.[128]

### b. Impartial Decisionmakers

Whether given the opportunity to be heard or not, however, Monroe contends that his appeals fell on deaf—indeed, biased—ears. "Impartiality of the tribunal is an essential element of due process."[129] But the risk of bias must be "intolerably high" to violate due process.[130] A person claiming bias on the part of a decisionmaker "must overcome a presumption of honesty and integrity in those serving as adjudicators."[131] "To disqualify a decisionmaker, we require a 'substantial countervailing reason' to conclude he or she was 'actually biased *with respect to factual issues being adjudicated*.' "[132] "[A] personal stake in the outcome of the proceedings can create a conflict of interest sufficient to deprive an employee of an unbiased decision-maker" and thus overcome the honesty presumption.[133] "Personal stake" encompasses: "attempt[s] to seek self-vindication,"[134] "financial stake,"[135] "personal animosity,"[136] and "prior statements going to

---

[128] *See Riggins*, 572 F.3d at 1109 ("Riggins was provided the opportunity for a three-step review process, pursuant to which he was given written notice of the charges against him, an explanation of the evidence, and several opportunities to present his side of the story. Our cases do not require a more elaborate process than that."). A procedure that satisfies *Loudermill*, moreover, also can operate as "an adequate name-clearing hearing." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 526 (10th Cir. 1998).

[129] *Riggins*, 572 F.3d at 1112.

[130] *Id.* (quotation omitted).

[131] *Id.*

[132] *James v. Indep. Sch. Dist. No. I-050*, 448 F. App'x 792, 796 (10th Cir. 2011) (quoting *Hicks v. City of Watonga*, 942 F.2d 737, 746–47 (10th Cir. 1991) (emphasis original)).

[133] *Bjorklund*, 467 F. App'x at 766 (citing *Tonkovich*, 159 F.3d at 520).

[134] *Id.*

[135] *Cypert v. Indep. Sch. Dist. No. I-050*, 661 F.3d 477, 481 (10th Cir. 2011).

[136] *Id.*

the merits or animus that establish the decisionmaker cannot be fair."[137]   The parties dispute whether the facts show that Khatib and Corliss each possessed a "personal stake in the outcome" of Monroe's disciplinary proceedings.

Monroe first argues that Khatib and Corliss made firm, pre-decision statements respecting the facts affecting his discipline.   Monroe denounces certain statements provided to the media, to KS-CPOST, and directly to himself.   Monroe reasons that these remarks create an intolerably high risk of unfairness because once the City publicly justified its decision to terminate him it could not renege.   So, for example, on February 16, 2012, when Corliss acknowledged to the media that the ticket-fixing scandal was "a serious matter with serious consequences," the City had to seriously discipline Monroe.   When the City confirmed Monroe's terminated employment status on March 22, 2012, he alleges that it had to make every effort to ensure that result. And, finally, on April 11, 2012, once the LPD informed KS-CPOST that Monroe was terminated for being untruthful, Khatib and Corliss had to prevent Monroe's reinstatement by manipulating the grievance process.

"Firm public statements . . . . on the merits by those who must make factual determinations on contested fact issues" can prove bias.[138]   But the statements that Monroe identifies cannot.   Though made by the City's decisionmakers, these statements amount to the mere recitation of charges and discipline.[139]   Corliss' statement to the media does not advocate Monroe's termination.   Corliss' statement does not prejudge the facts supporting Monroe's

---

[137] *Riggins*, 572 F.3d at 1113.

[138] *Stanton v. Mayes*, 552 F.2d 908, 914 (10th Cir. 1977).

[139] *See id.* (distinguishing "firm public statements" showing bias from "the instigation of charges and a statement of them").

termination; it merely deems the overall scandal a serious matter for the City. Defendants' after-the-fact statements also fail to demonstrate unyielding bias. Confirming that the City no longer employed Monroe as of March 22, 2012—an action that City policy permitted, even despite the ongoing grievance process—hardly shows that the City had predetermined that Monroe must go. Likewise, timely explaining—in a statutorily required report that is unavailable to the general public—the alleged reasons for dismissing Monroe hardly committed Defendants to preventing Monroe's reinstatement. Considered alone and together, the statements do not "raise a sufficiently great possibility that [Khatib and Corliss] would be so psychologically wedded to their complaints that they would consciously or unconsciously" advocate a particular result to "avoid the appearance of having erred or changed position."[140] Therefore, these statements do not create an intolerably high risk of bias.

Next, Monroe deduces bias from the circumstances surrounding his step-two meeting with Khatib. In advance of the step-two meeting, Khatib drafted what became his step-two reply letter. Khatib readied the letter so that he could prepare for the meeting and, after the meeting, quickly issue a decision if Monroe failed to provide any new information that would alter Khatib's step-one termination decision. At the same meeting,[141] Khatib also asked Monroe to explain what Monroe meant when he wrote in his step-two letter to Khatib: "I believe that the reasons stated in the March 7, 2012 dismissal recommendation are a pretext for reasons that the Department does not wish to state in writing." Monroe questioned whether his response would make a difference to Khatib. Believing that Monroe's statement referred to unsubstantiated

---

[140] *Withrow v. Larkin*, 421 U.S. 35, 57 (1975).

[141] Khatib's deposition testimony explains that this exchange occurred either at the March 20, 2012 step-one meeting or at the step-two meeting. For the purposes of this Order, the Court accepts Monroe's position that the exchange took place at the step-two meeting.

allegations of racial bias, Khatib replied that Monroe's response would not affect his determination.

These circumstances do not demonstrate sufficient animus or bias to undercut Khatib's presumed impartiality. Despite Khatib's prewritten and oral statements at step two, the record does not indicate that Khatib denied Monroe the opportunity to present evidence in support of the reasons why he should not be discharged. In fact, while preparing his draft letter before the step-two meeting, Khatib considered and fairly responded to Monroe's written submission.[142] Monroe also fails to highlight any evidence available to him or actually presented at the step-two meeting that Khatib disregarded. And, of course, "[t]he mere showing that a supervisor initially recommended a dismissal and then met with the employee prior to that employee's termination is ordinarily insufficient to established a constitutional violation."[143] Accordingly, this evidence does not impeach Khatib's decision.

To the extent that Monroe considers Khatib's termination decision an effort to seek self-vindication, the Court finds no constitutional violation. Monroe claims that the 2010 investigation provided Khatib, then a captain, sufficient information to discipline MS; but he took no action in 2010 and no action once he became chief of police. Monroe directly challenged Khatib's inaction in his initial response to Khatib's termination decision, writing: "I am confident that, in a full airing of the issues, it will be clear that you had information when you were in charge of Internal Affairs, information I did not have, and you took no action." Khatib

---

[142] *See Mills v. Iowa*, 895 F. Supp. 2d 944, 963 (S.D. Iowa 2012) ("Although [plaintiff's supervisor] had already signed a termination letter regarding [plaintiff] at the time she read [plaintiff's] rebuttal, there is no dispute that [plaintiff's supervisor] read the rebuttal and considered it prior to directing the delivery of the termination letter to [plaintiff].").

[143] *Riggins*, 572 F.3d at 1114.

also made statements to the media designed to improve the LPD's image and, according to Monroe, to deflect Khatib's culpability for previously ignoring the ticket-fixing relationship between MS and RJ.  For example, Monroe repeats Khatib's statement that, "The information came in anonymously.  It was jumped on vigorously, and people are going to be held accountable."  From Monroe's perspective, a reasonable jury could conclude from these facts that, "contrary to his public statements, Khatib played a significant role in a potential scandal, that Khatib faced a direct accusation from Monroe regarding his prior knowledge and inaction, and ultimately that Khatib terminated Monroe to pin blame on him and deflect any blame from Khatib."  In short, Monroe complains that Khatib treated him unfairly because Khatib needed a scapegoat.

If such a risk is supported by Monroe's facts, the entire record before the Court does not show that risk as being intolerably high.  Monroe mischaracterizes Khatib's actions in 2010.  In 2010, Chief Olin determined that the evidence known at the time did not support disciplinary action.  Khatib respected his superior's determination.  No evidence indicates that Chief Olin reached an improper conclusion.  And even if he had, no evidence reveals that Khatib had the information to know that Chief Olin's decision was improper and had the authority to discipline MS either without Chief Olin's approval or retroactively once Khatib became chief.  Monroe's argument also overlooks the fact that Khatib did discipline MS as a result of the 2011–2012 investigation—when he had final disciplinary authority in the LPD as its chief of police.  Thus, the entire record reveals no blame attributable to Khatib for the failure to discipline MS in 2010. The risk of unfairness identified in *Bjorklund v. Miller* was intolerably high because the defendant-decisionmaker faced a direct, public accusation from plaintiff that plaintiff committed the alleged misconduct under the defendant's express instruction; thus, "[t]erminating

[plaintiff's] employment could [have] serve[d] to pin the blame on him and deflect any blame from [defendant]."[144]  Because the record here would not allow a reasonable jury to find that Khatib gained any personal advantage by terminating Monroe, the risk of actual bias is not unconstitutionally high.[145]

In any event, any bias attributable to Khatib is constitutionally harmless if the decisionmakers who reviewed Khatib's recommendation were impartial.[146]  Monroe does not challenge the grievance review board's neutrality at step three.[147]  But he does challenge Corliss' neutrality at step four, for reasons other than Corliss' public statements already discussed.  Like those statements, Monroe's additional reasons raise no concern about Corliss' impartiality.  The fact that Corliss initially approved Khatib's step-one termination decision does not disqualify him from reconsidering the discipline determination at step four.  In fact, the Tenth Circuit

---

[144] *Bjorklund*, 467 F. App'x at 766–67.

[145] Likewise, Monroe cannot create a genuine issue of fact regarding Khatib's impartiality merely because he directly criticized Khatib *after* Khatib's initial termination decision.  *See Hicks*, 942 F.2d at 740–41, 751 (finding a genuine issue of fact as to whether defendant-tribunal member was biased at the time of her decision because plaintiff and defendant previously exchanged multiple formal criticisms related to plaintiff's decision to cite defendant and defendant's son for traffic offense).

[146] *Riggins*, 572 F.3d at 1114–15 (recognizing authority that concludes "a neutral adjudicator is not a necessary component of due process at a pretermination hearing, so long as the plaintiff is afforded a hearing before a neutral adjudicator after termination").

[147] Instead, Monroe argues that the City provided the grievance review board strategically redacted investigative reports.  No evidence in the record supports Monroe's conclusion.  First, no evidence shows that the City should not have redacted the information, as it did, according to the Kansas Open Records Act.  Second, there is no factual basis for the Court to consider the excluded information exculpatory.
   Additionally, Monroe discredits the grievance board hearing because it "was a confidential proceeding, and the grievance board was not the governing body that discharged him."  Because no stigma resulted from the Defendants' media statements, Monroe did not suffer the same harm (and thus require the same remedy) discussed in his Sixth Circuit authority.  *See Gunasekera v. Irwin*, 551 F.3d 461, 470 (6th Cir. 2009) (explaining that a name-clearing hearing "with no public component" would be inadequate because "members of the public who had seen only the stories accusing him would not know that this stigma was undeserved").  Also, the grievance board was not the ultimate decisionmaker responsible for Monroe's termination; but it certainly was as much a part of the City of Lawrence as Khatib and Corliss.  And ultimately, the City of Lawrence is the governing body that discharged Monroe.

rejects this very argument.[148]   Corliss' regular communication with Khatib throughout the termination process also fails to undermine Corliss' presumed integrity.   The Constitution "do[es] not require a process where reviewing personnel are completely divorced from or blinded to the underlying nature of the reasons for dismissal."[149]   Though Khatib and Corliss discussed Monroe's termination, Corliss' "exposure to evidence [and] involvement in nonadversary investigative procedures is insufficient in itself to impugn the fairness of [the] later adversary hearing" at step four.[150]   The Court also cannot conclude—without additional facts not contained in the parties' filings—that Corliss' mind was "irrevocably closed on the subject" of Monroe's termination.[151]   The evidence shows that Corliss based his personnel decision on the sum of the entire record before him, including Monroe's written appeal and statements at the step-four meeting.

Considering this evidence, the Court finds any risk of unfairness associated with Monroe's presumptively fair decisionmakers to be constitutionally tolerable.   Because Monroe produces no evidence that the City deprived him of a liberty interest under intolerably unfair circumstances, the Court grants Defendants summary judgment on Monroe's due process claim and denies Monroe's respective cross-motion for summary judgment.

---

[148] *Riggins*, 572 F.3d at 1113–14 ("the fact that the same individuals made or approved the initial recommendation to terminate [plaintiff] and then presided over the [grievance] hearings . . .  is insufficient to establish a constitutional violation.").

[149] *Id.* at 1114.

[150] *Id.* (quotation omitted).

[151] *Id.* at 1112 (quotation omitted) ("The fact that [an agency] had entertained . . . views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject").

**C. Collateral Motions**

Having addressed the parties' four cross-motions for summary judgment, the Court now considers the parties' remaining five motions.  Monroe has three additional motions.  He moves to amend the pretrial order, to strike certain arguments and exhibits relating to Defendants' summary judgment reply briefs, and to supplement the summary judgment record.  Defendants have two additional motions.  Both motions seek to exclude or limit the testimony of Monroe's expert witnesses.  Because none of these motions would alter the Court's decision to grant Defendants' motions for summary judgment on all of Monroe's claims, the Court considers the parties' additional motions moot.

**D. Conclusion**

Under the circumstances presented, feeling wronged does not amount to being wronged.  The Court's measure of right is the Constitution, not its own or anyone else's conscience.  The Constitution asks the Court to consider the lawfulness of Plaintiff Monroe's termination. The evidence produced fails as a matter of law to show that Defendants unconstitutionally terminated Monroe due to his race and without due process.  Rather, the evidence shows that Defendants fired Monroe according to adequate procedures under the sincere belief that he took uncharacteristic but nonetheless inexcusable actions.   Accordingly, the Court dismisses Mornoe's claims with prejudice under Federal Rules of Civil Procedure Rule 56(a).

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment on Counts II and III (Discrimination Claims) (Doc. 194) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Due Process Claim (Doc. 195) is **GRANTED.**

**IT IS FURTHER ORDERED** Plaintiff's Motion in Limine, or in the alternative, Motion for Partial Summary Judgment Regarding Pretext (Doc. 156) is **DENIED.**

**IT IS FURTHER ORDERED** Plaintiff's Motion for Partial Summary Judgment Regarding Grievance Process Bias and Due Process (Doc. 155) is **DENIED.**

**IT IS FURTHER ORDERED** Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Thomas Bornholdt (Doc. 188) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Dr. Gary Baker (Doc. 190) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** Plaintiff's Motion to Amend the Pretrial Order (Doc. 229) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** Plaintiff's Motion to Strike Defendants' New and Inadmissible Summary Judgment Pleadings and Exhibits (Doc. 244) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** Plaintiff's Motion to Supplement Record on Partial Summary Judgment Motions (Doc. 253) is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

Dated this 20th day of August, 2015.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE